| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>EASTERN DISTRICT OF NEW YORK<br>----------------------------------------------------------x<br>In re:<br><br>WILLIAM ALESIUS,<br><br>                Debtors.<br>----------------------------------------------------------x<br>NEIL H. ACKERMAN, as Trustee of the<br>Bankruptcy Estate of WILLIAM ALESIUS,<br><br>                Plaintiff,<br><br>   - against -<br><br>WILLIAM ALESIUS and JOYCE ALESIUS<br>a/k/a JOYCE BENNETT ALESIUS a/k/a<br>JOYCE B. ALESIUS a/k/a JOYCE BROOKS,<br><br>                Defendants.<br>----------------------------------------------------------x | NOT FOR PUBLICATION<br><br><br>Case No. 806-71218-478<br><br>Chapter 7<br><br><br><br><br><br>Adv. Pro. No. 808-08099-478 |

## MEMORANDUM DECISION AND ORDER

Appearances:

        Meltzer, Lippe, Goldstein & Breitstone, LLP
        *Attorneys for the Plaintiff Trustee*
        By: Neil H. Ackerman, Esq.
        Kamini Fox, Esq.
        190 Willis Avenue
        Mineola, New York 11501

        Rosenberg Musso & Weiner LLP
        *Attorneys for the Defendants*
        By: Robert J. Musso, Esq.
        26 Court Street
        Suite 2211
        Brooklyn, New York 11242

The Honorable Dorothy T. Eisenberg, United States Bankruptcy Court

Before the Court is the Chapter 7 Trustee's motion for summary judgment. The Court has jurisdiction pursuant to 28 U.S.C. § 1334(a) and (b). This contested matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (E), (F), (H), (M), (N) and (O) and 11 U.S.C. §§ 105(a), 323, 363(h), 363(j), 541, 542, 544, 547 to 551 and N.Y. Debt. and Creditor Law §§ 270-279 and the Rule 7001(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). The following constitutes the Court's finding of fact and conclusions of law as mandated by Bankruptcy Rule 7052.

## FACTS

The Debtor, William Alesius, met Joyce Alesius a/k/a Joyce Bennett Alesius a/k/a Joyce B. Alesius a/k/a Joyce Brooks ("Joyce"), in 1991 and within a year thereafter they decided to live together and at some point became engaged. The Debtor was previously married and was required to pay for child support for his child. The Debtor would give Joyce whatever money he had left over from his paycheck to pay for household bills during the time they lived together. The Debtor married Joyce in May of 2001.

Prior to their marriage, the Debtor had outstanding federal and state tax debt obligations arising from a failed business known as Calbar Corporation ("Calbar"), in which the Debtor and his first wife, Lorraine Alesius, had a 50% interest. A tax warrant was issued by the New York State Department of Taxation and Finance on December 9, 1993 against the Debtor in the amount of $29,408.55 with respect to Calbar which the Debtor eventually satisfied on June 12, 2001. The Debtor also owed approximately $460,000 in federal tax liability relating to Calbar which according to the Debtor was reduced to approximately $120,000 but was never satisfied.

In 1993, the Debtor, his brother, Thomas Alesius ("Thomas") , and their mother, Mima

Alesius ("Mima"), discussed plans regarding the disposition of Mima's assets upon her death and her will. The Debtor informed his mother that due to a pending IRS case against him, the Debtor "cared not to have any assets in [his] name" and that "it would not be in [his] best interest" until the IRS case was resolved. In June of 1998, Mima, transferred her 100% interest in 1305 Darby Road East in Wantagh, New York (the "Wantagh Property") pursuant to a deed to herself, Joyce and Thomas, with each receiving a one-third ownership interest with the right of survivorship. Joyce never paid any bills associated with the Wantagh Property and never resided at the Wantagh Property.

Mima passed away on November 4, 1999. The Debtor handled the funeral arrangements and obtained the death certificate. Mima's Last Will and Testament, dated August 6, 1998, bequeathed all her personal property to her son Thomas and reflected Mima's intention that no provision will be made for her son, William Alesuis, "for reasons best known between ourselves." The Debtor stated that he and his mother did not get along and it was basically a division in the family between his parents even though they were married and resided together. No detailed explanation or evidence was provided as to the nature of the division or to support the assertion that animosity existed between the Debtor and his mother.

After Mima's death, Thomas and Joyce sold the Wantagh Property on March 24, 2000 for $225,000. Joyce received approximately $106,000 representing her share of the proceeds of sale of the Wantagh Property and she deposited the proceeds in a bank account.

On November 3, 2000, Joyce purchased real property located at 8 Wren Court, Commack, New York (the "Commack Property") for $325,000. Joyce used some of the proceeds from the sale of the Wantagh Property toward the down payment and obtained a mortgage of $260,000 for

Case 8-08-08099-dte    Doc 31    Filed 03/26/09    Entered 03/26/09 15:16:18

the purchase of the Commack Property. The Debtor and Joyce have resided at the Commack Property since November 2000. Joyce continues to pay all the bills and household living expenses, while the Debtor contributes by giving Joyce the monies left over from his paycheck after the payment of child support to help pay household expenses. The Debtor rarely handles the finances or writes any checks relating to the household.

Joyce refinanced the Commack Property in 2003 and obtained an equity line of credit from Fairbanks Capital Corp. in the amount of $73,000 to pay off credit card debt and for living expenses. In 2004, Joyce refinanced the Commack Property again with a variable rate loan from Washington Mutual Bank and paid off the original mortgage and the equity line of credit. Joyce received approximately $11,705.57 from the second refinancing which she used to make improvements to the Commack Property. As of July 2008, the required minimum monthly mortgage payment was $3,000.85 and the full monthly principal and interest payment was approximately $3,700 per month which would be about $44,400 annually.

Joyce's wages ranged from a high of $50,946 in 2001 to a low of $13,269 in 2003, with her adjusted gross income reaching a high of $53,655 in 1999 as a result of IRA distributions and other income. Joyce works part-time, 20 to 25 hours per week making $20.00 an hour or approximately $26,000 annually. Given Joyce's income, it is uncertain whether Joyce alone had the financial means to make the mortgage payments and other household expenses on her own.

The Debtor reported earned income on his tax returns in the amount of $18,900 in 1999, $35,700 in 2000, and $36,400 in 2001 and in 2002. For 2003, the Debtor had a net profit of $102,663 from the operation of a business and earned income of $32,200. In 2004, the Debtor reported $22,750 in wages and $4,200 in unemployment compensation. From 1999 to 2004, the


Case 8-08-08099-dte    Doc 31    Filed 03/26/09    Entered 03/26/09 15:16:18

the purchase of the Commack Property. The Debtor and Joyce have resided at the Commack Property since November 2000. Joyce continues to pay all the bills and household living expenses, while the Debtor contributes by giving Joyce the monies left over from his paycheck after the payment of child support to help pay household expenses. The Debtor rarely handles the finances or writes any checks relating to the household.

Joyce refinanced the Commack Property in 2003 and obtained an equity line of credit from Fairbanks Capital Corp. in the amount of $73,000 to pay off credit card debt and for living expenses. In 2004, Joyce refinanced the Commack Property again with a variable rate loan from Washington Mutual Bank and paid off the original mortgage and the equity line of credit. Joyce received approximately $11,705.57 from the second refinancing which she used to make improvements to the Commack Property. As of July 2008, the required minimum monthly mortgage payment was $3,000.85 and the full monthly principal and interest payment was approximately $3,700 per month which would be about $44,400 annually.

Joyce's wages ranged from a high of $50,946 in 2001 to a low of $13,269 in 2003, with her adjusted gross income reaching a high of $53,655 in 1999 as a result of IRA distributions and other income. Joyce works part-time, 20 to 25 hours per week making $20.00 an hour or approximately $26,000 annually. Given Joyce's income, it is uncertain whether Joyce alone had the financial means to make the mortgage payments and other household expenses on her own.

The Debtor reported earned income on his tax returns in the amount of $18,900 in 1999, $35,700 in 2000, and $36,400 in 2001 and in 2002. For 2003, the Debtor had a net profit of $102,663 from the operation of a business and earned income of $32,200. In 2004, the Debtor reported $22,750 in wages and $4,200 in unemployment compensation. From 1999 to 2004, the

Debtor worked as a project manager for a company named HT Steel and his starting salary was $160,000 and that by the time he was laid off in 2004, he was earning $190,000. Obviously there is a discrepancy between what the Debtor claimed to have earned during those years and what was reported for tax purposes. At the time of the Debtor's bankruptcy filing, the Debtor was employed by Beach Erectors, Inc. and his weekly pay stubs showed a gross income of $2,000 per week or $104,000 on an annualized basis or a weekly net income of approximately $1,280 after deduction for medical insurance.

In September 2003, the Debtor transferred his interest in a 1998 Silverton boat (the "Vessel") to Joyce. The Vessel was subject to a mortgage. The insurance for the Vessel remained in the Debtor's name and the Trustee submitted a copy of a check signed by Joyce in April of 2006 to pay for insurance on the Vessel from the Defendants' joint account. Joyce stated that she paid for the expenses of keeping the Vessel such as dockage and storage but no evidence has been submitted to support this. In 2006, Joyce sold the Vessel for $34,000 to a third party. The mortgage on the Vessel was paid off a few years prior to the sale of the Vessel. Joyce received checks totaling $29,400 relating to the sale of the Vessel which she used to pay off debts and for living expenses.

The Debtor filed for chapter 7 bankruptcy relief on May 31, 2006 (the "Petition Date"). Neil H. Ackerman, Esq. was appointed the Chapter 7 Trustee of this case.

The Debtor's original schedules show that he owed more than $102,520.50 of debt as of the Petition Date and at least 4 of the debt obligations were owed before and as of March 24, 2000. In addition, the IRS filed a proof of claim stating that the Debtor owed federal personal income taxes for the 1992 to 1995 taxable years in the secured amount of $20,785.37. The

overdue taxes were assessed in 1996 and a Notice of Tax Lien was filed in June of 1997. In addition, the IRS proof of claim sets forth that the Debtor owes a total of $81,724 in personal income taxes from 1996 to 2004 with interest in the amount of $14,528.09 for an unsecured priority claim of $96,252.09. These taxes were assessed in July of 2002 and May of 2006. In addition, the IRS has asserted an unsecured claim for penalty on the unsecured priority claims including interest thereon in the sum of $22,554.18. These tax liens remain due and outstanding as of the Petition Date. The IRS proof of claim does not contain any claim for the Debtor's liability arising from Calbar Corporation. The Debtor explained that he no longer owes the federal tax liability relating to Calbar because the statute of limitation has passed.

The Debtor asserts that he owed federal personal income taxes because in the early 1990s he was paying an exorbitant amount of child support which he could not afford because his salary was not too high. The Debtor stated that one of the attorneys hired by him advised him not to pay taxes and that the taxes would be handled by offering a compromise. Since then, the Debtor stated that he has been attempting to work out an offer and compromise with the IRS but such efforts were put on hold due to the Debtor's bankruptcy filing.

The Trustee commenced an adversary proceeding against the Debtor and Joyce on May 31, 2008 seeking 1) a turnover of documents relating to the payment of mortgages, utilities, and maintenance and improvements to the Commack Property, and documents relating to the ownership and upkeep and maintenance of the Vessel; 2) a judgment that the Debtor's transfer of monies and other property to pay for the mortgages, utilities, maintenance and other carrying costs of, and improvements, to the Commack Property, and the Vessel (collectively, the "Money Transfers"), and the Debtor's causing title to the Commack Property and/or the Vessel to be

placed solely in the name of Joyce (the "Property Transfers"), constituted either actual intent to defraud or constructive intent to defraud by way of fraudulent conveyances; 3) a judgment against Joyce for unjust enrichment and that the bankruptcy estate owns all and in no event less than 50% of the Commack Property and the Vessel; 4) an avoidance of any portion of the Transfers to Joyce within one year prior to the Petition Date that was for an antecedent debt owed by the Debtor to Joyce as such transfer constitutes a preference; 5) a judgment that the Commack Property and the Vessel are subject to an equitable lien or a constructive trust in favor of the bankruptcy estate; 6) to the extent the bankruptcy estate does not own the entire equitable interest in the Commack Property or the Vessel, a judgment authorizing the Trustee to sell the estate's interest as well as Joyce's interest in the Commack Property and the Vessel pursuant to 11 U.S.C. § 363(h); and 7) a judgment permitting the Trustee to distribute all proceeds of sale.

The Defendants filed an Amended Answer on July 3, 2008. On November 25, 2008, the Trustee filed this motion for summary judgment on all of the causes of action alleged in his Amended Complaint, especially seeking 1) the turnover of documents, 2) authorization to avoid and recover the transfer of a) the Wantagh Property, b) monies to pay for the mortgages, carrying charges, and improvements associated with the Commack Property, and c) the Vessel (the "Transfers"), to Joyce, or a judgment finding that bankruptcy estate has an equitable interest in the Transfers on the basis of unjust enrichment, equitable lien, and constructive trust, and 3) authorization to sell the Commack Property (the "Summary Judgment Motion").

The Defendants filed an objection to the Summary Judgment Motion (the "Objection") on January 6, 2009. The Defendants request in their Objection that the Court make a determination that the Debtor could not have fraudulently transferred the Wantagh Property or Commack

Property to Joyce because the Debtor never had an interest in such Properties. In addition, the Defendants request that the Court find that the Money Transfers cannot be avoided by the Trustee as a fraudulent conveyance because the transfer of money between spouses to pay their joint living expenses constitutes reasonably equivalent value.

A hearing on the Summary Judgment Motion was held on January 27, 2009.

## DISCUSSION

1.      General.

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure as made applicable by Bankruptcy Rule 7056, the Court may award summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

When no genuine triable issues of material fact exist, the moving party is entitled to judgment as a matter of law and summary judgment should be granted. *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11-12 (2d Cir. 1986). The mere production of some evidence in support of the opposing party's position will not justify denial of a summary judgment motion, unless the court finds that there is evidence upon which a jury can properly proceed to find a verdict for the party opposing the motion. *American v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Instead, the opposing party must "set forth specific facts showing that there is a genuine issue for trial." *Williams v. Smith*, 781 F.2d 318, 323 (2d Cir. 1986). A court must always "resolve ambiguities and draw reasonable inferences against the moving party." *King v. United States Fire Ins. Co.*, 804 F.2d at 11. However, the opposing party may not rely upon

"mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Id.,* 804 F.2d at 12.

Defendants argue that there are genuine issues of material fact in dispute as to the existence of almost all of the debt scheduled by the Debtor as of March 24, 2000, the date Thomas and Joyce sold the Wantagh Property and whether the tax issues arising out of Calbar existed on the date Mima Alesius transferred the Wantagh Property. The Court notes that while the Debtor's federal tax liability relating to Calbar may have been one of the reasons why the Debtor was reluctant to have any assets in his name, the IRS has not asserted any prepetition claim relating to Calbar. However, the Defendants do not dispute that the Debtor owed personal income taxes to the IRS at the time of the transfer of the Wantagh Property and that such taxes are still due and owing. In fact, it would appear that the Debtor deliberately failed to pay his personal income taxes in order to try to pay his other expenses in the belief that he could obtain an offer and compromise with the IRS. The amount of the tax outstanding is irrelevant. Accordingly, there is no genuine issue of fact as to whether the Debtor had debts that were unpaid during the time of the alleged Transfers that were still outstanding on the Petition Date.

2.    Transfer of the Wantagh Property.

The Defendants argue that because the Debtor never had an interest in the Wantagh Property or the Commack Property, the Debtor could not have, and did not, transfer to Joyce any interest in those properties. Whether the Debtor had an interest in the Wantagh Property which he allegedly transferred by declining to accept such interest from his mother for purposes of 11 U.S.C. § 548 is dependent upon whether the Debtor had an interest in such as defined by state

law. *Butner v. United States*, 440 U.S. 48, 54, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979).

Under New York law, a parent may exclude a child or other descendants from any participation in his or her estate for whatever reason. 38 N.Y. Jur. 2d Decedents' Estates § 348. See *In re Will of Ryan*, 34 A.D.3d 212, 824 N.Y.S.2d 20 (N.Y. App. Div. 2006). Moreover, a beneficiary of a disposition may renounce all or part of his interest provided that the renunciation shall be in writing, signed and acknowledged by the person renouncing the disposition, and shall be filed with the appropriate court within nine months after the effective date of the disposition. N.Y. Est. Powers and Trusts Law § 2-1.11(b). A person may not make a renunciation with respect to any property which he has accepted an interest in such property by accepting delivery or payment, transferring or encumbering any part of such interest, or exercising control as a beneficial owner of such interest. N.Y. Est. Powers and Trust Law § 2-1.11(f).

'It is settled that a renunciation will be honored even when its purpose is to keep the bequest beyond the reach of the creditors of the renouncing party. The policy underlying statutes recognizing a right to renounce are "based upon the concept that no one should be forced to accept an inheritance or a gift, whether [it] comes about by will, inter vivos gift, or operation of a statute."' *Molloy v. Bane*, 214 A.D.2d 171, 174, 631 N.Y.S.2d 910 (N.Y. App. Div. 1995)(internal citations omitted); *Estate of Schiffman*, 105 Misc.2d 1025, 1026, 430 N.Y.S.2d 239 (N.Y. Sur. Ct. 1980). "[R]enunciation is not a transfer but a refusal to accept a gift." *Estate of Oot*, 95 Misc.2d 702, 408 N.Y.S.2d 303 (N.Y. Sur. Ct. 1978).

"Unless the creator of the disposition has otherwise provided, the filing of a renunciation, as provided in this section, has the same effect with respect to the renounced interest as though the renouncing person had predeceased the creator or the decedent . . .." N.Y. Est. Powers and

Trust Law § 2-1.11(d). As a result, New York fraudulent transfer laws do not apply to a renunciation because the renouncing party never had an interest in the disposition. *Estate of Oot*, 95 Misc.2d at 306. Similarly, a prepetition disclaimer of interest in property does not subject the property to the claims of any of the disclaimant's creditors for purposes of 11 U.S.C. § 548 because the disclaimant never had an interest in the property. *In re Costas*, 555 F.3d 790 (9th Cir. 2009); *Blackwell v. Lurie (In re Popkin & Stern)*, 223 F.3d 764, 768 (8th Cir. 2000); *Jones v. Atchison (In re Atchison)*, 925 F.2d 209 (7th Cir. 1991). This is so even if the disclaimant's child becomes the beneficiary of the disclaimed property as a result of the renunciation. *In re Popkin & Stern*, *supra*; *In re Atchison*, *supra*.

The difference in the facts before this Court is that the Debtor had informed his mother that he did not want any property in his name and the transfer of the Wantagh Property occurred outside the context of a will but was made directly by Mima to herself, Joyce and Thomas. Although Joyce used the proceeds of sale from the Wantagh Property to purchase the Commack Property and the Debtor resides in the Commack Property, there is no evidence that the Debtor ever accepted an interest in the Wantagh Property, sought to encumber or exercised control over such property. Accordingly, the Debtor never had an actual interest in the Wantagh Property that he could transfer to Joyce but rather Joyce acquired her interest in the Wantagh Property directly from Mima.

Even if the Debtor was expressly given an interest in the Wantagh Property under Mima's will, he would have been entitled to, and would have been allowed to, renounce his interest in such property to the detriment of his creditors for the benefit of a potential insider or relative, in this case, Joyce. Accordingly, the Court does not find that the result under the facts and

circumstances of this case should be any different from the result if Mima had bequeath an interest in the Wantagh Property to the Debtor and the Debtor went through the formality of filing a renunciation. Moreover, the transfer of the Wantagh Property to Joyce occurred when the Debtor and Joyce were not married even though they were in a long term relationship or possibly engaged and approximately 8 years prior to the Petition Date. Accordingly, the Court finds that there was no transfer of the Wantagh Property from the Debtor to Joyce for purposes of New York Debtor and Creditor Law and 11 U.S.C. § 548.

3.    The Money Transfers.

With respect to the alleged Money Transfers, the Trustee alleges that the Money Transfers are part of a scheme by the Debtor to safeguard his assets by transferring funds to Joyce to enable Joyce to pay the mortgage on the Commack Property and other living expenses in order to obtain the benefits of the Commack Property without his creditors being able to attach any lien on such property. The Defendants argue that courts in other districts have found that a transfer of money between spouses to pay their joint living expenses cannot be avoided by a trustee as a fraudulent conveyance because a debtor receives "reasonably equivalent value" for the money transferred and urge the Court to hold the same. Alternatively, the Defendants argue that the Trustee's Summary Judgment Motion should be denied with respect to the Money Transfers because the Trustee cannot prove that the Debtor gave Joyce the monies with the intent to defraud his creditors and the Debtor received consideration for the Money Transfers because Joyce "paid" all of their household bills and maintained their household.

The real issue before the Court with respect to the Money Transfers is not as the

Defendants argue whether monies to pay for joint living expenses were proper or improper and whether the Debtor was given appropriate credit for his contribution to living expenses but whether the Debtor's transfer of funds to Joyce enabled her to pay the note and mortgage and make improvements to the Commack Property in order to enhance the value of such property and thereby giving Joyce an increase in the equity in the Commack Property for no consideration. The Trustee provides calculations that from 2003 to 2006 funds of approximately $472,000 in excess of Joyce's salary were transferred into the her bank accounts. Given Joyce's limited income, it is unlikely that Joyce would have been able to meet all of her expenses and the Defendants' joint expenses with her income alone. Indeed, the Debtor acknowledged turning over his paycheck to Joyce to contribute toward those expenses. However, there is no evidence that Joyce benefitted from the entire $472,000 to the detriment of the Debtor's creditors by using the funds for her own benefit. There is no evidence showing how much of the funds were used to pay expenses that would have been attributed to Joyce, the Debtor or both, and how much were used to benefit Joyce in terms of paying off her obligation on the note and mortgage and improving upon the Commack in order to increase Joyce's equity in the Commack Property. Accordingly, the issue of whether the Money Transfers by the Debtor to Joyce with respect to the Commack Property should be voided cannot be determined on a motion for summary judgment as genuine issues of fact exist as to whether the Debtor improperly transferred funds to Joyce without reasonable equivalent value and the amount of such transfers.

4.    The Vessel Transfer.

With respect to the Vessel, the Trustee seeks to avoid the Debtor's transfer of the Vessel

to Joyce under his third cause of action as an actual or constructive transfer intended to defraud the Debtor's creditors. There is some evidence that certain badges of fraud exist such that the Trustee can probably establish an actual intent by the Debtor to defraud his creditor by transferring personal property that could be attached by creditors to Joyce during their marriage. At the time of the transfer in 2003, the Debtor earned more than Joyce and it is unlikely that the transfer was made because Joyce could better afford the payments associated with the cost of maintaining the Vessel than the Debtor. There is no evidence submitted by the Defendants to indicate that the transfer was for the payment of any antecedent debt owed to Joyce prior to the marriage. As noted by the Trustee, any transfer for love and affection does not constitute fair consideration for a transfer made between a husband and wife. *In re Marlar*, 252 B.R. 743 (8th Cir. B.A.P. 2000); *In re Treadwell,* 699 F.2d 1050, 1051 (11th Cir. 1983). However, the court finds that there are issues of material fact as to whether Joyce gave any consideration for the Vessel, and whether the Debtor retained possession, benefit or use of the Vessel. Accordingly, the Court declines to grant the Trustee's Summary Judgment Motion relating to the Vessel at this time.

Moreover, the Court notes that the Defendants have hindered the Trustee's prosecution of this case by failing to comply with the Trustee's request to turn over documents relating to bank statements from 2000 to 2002, complete copies of recent mortgage statements, and other documents. Accordingly, the Court grants the Trustee's Summary Judgment Motion with respect to his first cause of action seeking the turnover of documents.

## CONCLUSION

Based upon the foregoing, the Trustee's Summary Judgment Motion with respect to the first cause of action seeking a turnover of documents is granted as those documents are necessary to determine the facts of the case. The Plaintiff's Summary Judgment Motion with respect to the Wantagh Property is denied and the Defendants' request for summary judgment on the issue that the transfer of the Wantagh Property by Mima to Joyce did not constitute a fraudulent transfer for purposes of New York Debtor and Creditor Law and 11 U.S.C. § 548 is granted. The Trustee's Motion for Summary Judgment with respect to the Money Transfers and the Vessel is denied at this time.

The Trustee's request for summary judgment in regard to his claims under 11 U.S.C. § 363(h) is inappropriate in this Summary Judgment Motion.

Trial on the remaining causes of action with respect to the Money Transfers and the Vessel and the 11 U.S.C. § 363(h) issues shall be held on June 8, 2009 at 10:00 a.m.

So ordered.


Dated: Central Islip, New York
       March 26, 2009

      *s/ Dorothy Eisenberg*
      Dorothy Eisenberg
      United States Bankruptcy Judge