UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re:

WILLIAM ALESIUS,

             Debtors.

------------------------------------------------------------x
NEIL H. ACKERMAN, as Trustee of the
Bankruptcy Estate of WILLIAM ALESIUS,

             Plaintiff,

      - against -

WILLIAM ALESIUS and JOYCE ALESIUS
a/k/a JOYCE BENNETT ALESIUS a/k/a
JOYCE B. ALESIUS a/k/a JOYCE BROOKS,

             Defendants.

------------------------------------------------------------x

Case No. 06-71218-478

Chapter 7

Adv. Pro. No. 08-08099-478

# MEMORANDUM DECISION

Appearances:

        Meltzer, Lippe, Goldstein & Breitstone, LLP
        *Attorneys for the Plaintiff Trustee*
        By: Kevin R. Toole, Esq.
        190 Willis Avenue
        Mineola, New York 11501

        Rosenberg Musso & Weiner LLP
        *Attorneys for the Defendants*
        By: Robert J. Musso, Esq.
        26 Court Street
        Suite 2211
        Brooklyn, New York 11242

The Honorable Dorothy Eisenberg, United States Bankruptcy Court

William Alesius (the "Debtor") filed for chapter 7 bankruptcy relief on May 31, 2006 (the "Petition Date") and Neil H. Ackerman, Esq. was appointed as the Chapter 7 Trustee (the "Trustee"). On May 31, 2008 the Trustee commenced the instant adversary proceeding against the Debtor and his wife Joyce Alesius ("Joyce") (collectively, the "Defendants"). A trial was held on January 14, 2010 and continued on May 18, 2010 (the "Trial"). The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334 and § 157(b)(2)(A), (E) and (O). The following constitutes the Court's finding of fact and conclusions of law as mandated by Bankruptcy Rule 7052.

## FACTS:

1. *Background*

A. <u>The Wantagh Property</u>

The Defendants met in 1991 and were married in 2001. Prior to their marriage, the Debtor had outstanding federal and state tax debt obligations arising from a failed business known as Calbar Corporation ("Calbar"), in which the Debtor and his first wife, Lorraine Alesius, had a 50% interest. A tax warrant was issued by the New York State Department of Taxation and Finance on December 9, 1993 against the Debtor in the amount of $29,408.55 with respect to Calbar which the Debtor eventually satisfied on June 12, 2001. The Debtor also owed approximately $460,000.00 in federal tax liability relating to Calbar which according to the Debtor was reduced to approximately $120,000.00 but was never fully satisfied.

In 1993, the Debtor, his brother, Thomas Alesius ("Thomas"), and their mother, Mima Alesius ("Mima"), discussed plans regarding the disposition of Mima's assets upon her death and her will. The Debtor informed his mother that due to a pending IRS case against him, the Debtor "cared not to have any assets in [his] name" and that "it would not be in [his] best interest" until the IRS case was resolved. In June of 1998, Mima transferred her 100% interest in real property

2

(the "Wantagh Property") pursuant to a deed to herself, Joyce and Thomas. Joyce was not married to the Debtor at that time. Joyce never paid any bills associated with the Wantagh Property and never resided at the Wantagh Property.

Mima passed away on November 4, 1999, and her Last Will and Testament, dated August 6, 1998, bequeathed all her personal property to her son Thomas and reflected Mima's intention that no provision will be made for her son, William Alesuis, "for reasons best known between ourselves." After Mima's death, Thomas and Joyce sold the Wantagh Property on March 24, 2000 for $225,000.00. Joyce received approximately $106,000.00 representing her share of the proceeds of sale of the Wantagh Property and she deposited the proceeds in a bank account.

B. <u>The Commack Property</u>

On November 3, 2000, prior to marrying the Debtor, Joyce purchased real property located at 8 Wren Court, Commack, New York (the "Commack Property") for $325,000.00. Joyce used some of the proceeds from the sale of the Wantagh Property for the down payment and obtained a mortgage of $260,000.00 for the purchase of the Commack Property. The Debtor and Joyce subsequently married and have resided at the Commack Property since November 2000. Only Joyce's name is on the title.

Joyce refinanced the Commack Property in 2003 and obtained an equity line of credit from Fairbanks Capital Corp. in the amount of $73,000.00 to pay off credit card debt and for living expenses. In 2004, Joyce refinanced the Commack Property again with a variable rate loan from Washington Mutual Bank and paid off the original mortgage and the equity line of credit. The regular monthly payment on the Washington Mutual mortgage was $2,741.59, resulting in annual payments of approximately $32,899.00. Both Joyce and the Debtor jointly contribute to

cover the mortgage payments and household living expenses, but at the Trial both acknowledged that there were times when Joyce's income was insufficient to cover the payments and household expenses, and the Debtor paid those bills and expenses.

C. <u>The Vessel</u>

Around 1984 the Debtor purchased a 1981 Silverton 34' inboard motor boat (the "Vessel") for $45,000.00, which was financed with a loan. The costs to maintain the Vessel were $100.00 in monthly insurance payments and $200.00 in monthly mooring and storage costs. (5/18/10 Tr. at 57-58). In September 2003, the Debtor transferred his interest in the Vessel to Joyce. It is undisputed that Joyce did not pay any consideration for the Vessel. (1/14/10 Tr. at 116-117 & 5/18/18 Tr. at 59). The Defendants both testified that the Vessel was a gift from the Debtor to Joyce, and that it was done because earlier in their relationship Joyce had contributed funds to cover the costs of several expenses of the Debtor. The costs of owning and maintaining the Vessel were paid from the pooled income of the Defendants. Around July 2006, Joyce sold the Vessel for $34,000.00 to a third party. The Debtor's loan on the Vessel, which was solely in his name, had been paid off prior to the sale. The proceeds of the sale of the Vessel were deposited into Joyce's account and were used to pay the Defendants' household expenses.

D. <u>The Defendants' Financials</u>

One of the witnesses called at the Trial was the Trustee's Accountant (the "Accountant"). The Accountant performed an analysis of the Defendants' financial records that the Defendants turned over, and testified as to his findings. The Defendants did not challenge the Accountant's testimony or his analysis.

According to the Accountant, within the six years prior to the Debtor's filing Joyce's net available income was $34,567.00 in 2001, $30,076.00 in 2002, $10,924.00 in 2003, $17,064.00

in 2005 and $22,301.00 in 2006. Tax records for 2004 were not turned over for Joyce, but she did testify that she only earned approximately $172.00 in 2004 due to her work at a part time job. (1/14/10 Tr. at 105-107). For that same period the Debtor's net available income was $23,401.00 in 2001, $24,643.00 in 2002, $123,367.00 in 2003, $78,018.00 in 2004, and $44,713.00 in 2005. The Debtor did not produce a tax return for 2006. The substantial increase in Debtor's income in 2003 was due to a net profit from the operation of a business as well as his earned income. According to the Accountant, the mortgage payments from 2002 to 2006 were as follows: $27,392.00 in 2002; $28,962.00 in 2003; $22,634.00 in 2004; $25,884.00 in 2005; and $11,231.00 in 2006 (the amount paid on the mortgage prior to the Petition Date). It is clear that Joyce's income alone was not enough to make the mortgage payments in 2003, 2004, and 2005, but her income appears to have exceeded the mortgage payments in 2002 and 2006.

The Debtor's original schedules show that he owed more than $102,520.50 of debt as of the Petition Date, and valued his assets at approximately $54,290.00. The IRS filed a proof of claim stating that the Debtor owed the following: (a) a priority amount of $96,252.00 for tax years 1996, 1997, 1998, 2003 and 2004; (b) a secured amount of $20,785.37 for the 1992 to 1995 taxable years; and (c) an unsecured amount of $22,544.18 for interest on the foregoing amounts (the "IRS Claim"). These tax liens remain due and outstanding as of the Petition Date. In addition, a review of the claims registry in the Debtor's bankruptcy case shows that the Debtor owed additional unsecured debt of approximately $20,000.00. At the time of the payments on the mortgage and the transfer of the Vessel to Joyce, the Debtor was obligated to creditors for his debts.

2. *The Trustee's Adversary Proceeding*

The Trustee commenced an adversary proceeding against the Debtor and Joyce on May 31, 2008 seeking 1) a turnover of documents relating to the payment of mortgages, utilities, and maintenance and improvements to the Commack Property, and documents relating to the ownership and upkeep and maintenance of the Vessel; 2) a judgment that the Debtor's transfer of monies and other property to pay for the mortgages, utilities, maintenance and other carrying costs of, and improvements, to the Commack Property (the "Money Transfers"), and the Vessel (the "Vessel Transfer"), and the Debtor's causing title to the Commack Property and/or the Vessel to be placed solely in the name of Joyce (the "Property Transfers"), constituted either actual intent to defraud or constructive intent to defraud by way of fraudulent conveyances; 3) a judgment against Joyce for unjust enrichment and that the bankruptcy estate owns all and in no event less than 50% of the Commack Property and the Vessel; 4) an avoidance of any portion of the Transfers to Joyce within one year prior to the Petition Date that was for an antecedent debt owed by the Debtor to Joyce as such transfer constitutes a preference; 5) a judgment that the Commack Property and the Vessel are subject to an equitable lien or a constructive trust in favor of the bankruptcy estate; 6) to the extent the bankruptcy estate does not own the entire equitable interest in the Commack Property or the Vessel, a judgment authorizing the Trustee to sell the estate's interest as well as Joyce's interest in the Commack Property and the Vessel pursuant to 11 U.S.C. § 363(h); and 7) a judgment permitting the Trustee to distribute all proceeds of sale. The Defendants filed an Amended Answer on July 3, 2008.

3. *The March 2009 Memorandum Decision*

Both the Trustee and the Defendants moved for summary judgment on the Complaint, and on March 26, 2009, the Court issued a Memorandum Decision and Order (the "March 2009 Memorandum Decision"). The March 2009 Memorandum Decision granted summary judgment for the Trustee on the First Cause of Action requiring document production. As to the Second

Cause of Action, the Court granted the Defendants' motion for summary judgment, finding that the transfer of the Wantagh Property by Mima to Joyce did not constitute a fraudulent transfer for purposes of New York Debtor and Creditor Law ("DCL") and 11 U.S.C. § 548. Determining that there were issues of fact with respect to the Money Transfers and the Vessel, the Court denied the motions for summary judgment as to those causes of action, and scheduled the Trial.

## DISCUSSION:

### 1. The Commack Property

Pursuant to the March 2009 Memorandum Decision, the Court has already determined that the transfer of the Wantagh Property from Mima to Joyce did not constitute a fraudulent conveyance, and that the Wantagh Property was not part of the Debtor's estate. Therefore, the proceeds from the sale of the Wantagh Property are also not part of the Debtor's estate, and Joyce's use of those proceeds to purchase the Commack Property does not entitle the Trustee to claim an interest in the Commack Property. As such, the Trustee's request for the Court to award him an equitable lien against the Commack Property is denied. In furtherance of this finding, the Court denies the Trustee's sixth cause of action, which requests a judgment authorizing the Trustee to sell the estate's interest, as well as Joyce's interest, in the Commack Property pursuant to 11 U.S.C. § 363(h). The Court also denies the Trustee's seventh cause of action, which requests a judgment permitting the Trustee to distribute all of the proceeds from the Trustee's proposed sale in the sixth cause of action.

### 2. The Money Transfers

a. <u>Actual Intent Fraudulent Conveyances</u>

Additionally, the Trustee seeks to recover on the Money Transfers in the approximate amount of $294,000.00 that the Trustee alleges the Debtor transferred to Joyce. The Complaint

asserts that the Debtor's Money Transfers to Joyce rise to the level of actual intent fraudulent conveyances under 11 U.S.C. § 548(a)(1)(A) and DCL § 276. Section 548(a)(1)(A) imposes liability if the Debtor "made such transfer … with actual intent to hinder, delay, or defraud" either present or future creditors. DCL §276 provides that "[e]very conveyance made and every obligation incurred with actual intent … to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."

As the Trustee correctly points out, fraudulent intent is generally not susceptible of direct proof, but the Court can make a finding of such fraudulent intent from the totality of the circumstances. *See In re Ventimiglia*, 362 B.R. 71, 81 (Bankr. E.D.N.Y. 2007). Thus, the Court must analyze the badges of fraud to determine whether or not actual fraudulent intent existed when the Debtor made the Money Transfers.

In ascertaining whether or not there is actual fraudulent intent, the Second Circuit looks at several badges of fraud, including:

1. lack or inadequacy of consideration;

2. family, friendship or close associate relationship between the parties;

3. retention of possession, benefit or use of the property in question by the debtor;

4. the financial condition of the transferor before and after the transfer in question;

5. the existence or cumulative effect of a pattern or series of transactions or course of conduct after the debt is incurred, the onset of financial difficulties, or pendency of threat of suits by creditors; and

6. the chronology of the events and transactions under inquiry.

*Solomon v. Kaiser (In re Kaiser),* 722 F.2d 1574, 1582-83 (2nd Cir. 1983). Regardless of the adequacy of consideration given, a Court can determine fraudulent intent if certain of these

8

badges exist. *See Ackerman v. Ventimiglia (In re Ventimiglia)*, 362 B.R. 71, 81 (Bankr. E.D.N.Y. 2007).

Here the Trustee has shown that the Debtor made transfers either to or on behalf of his wife in order to make the mortgage payments. Furthermore, the Debtor did have a debt with the IRS that he had not paid off while he was making the mortgage payments, and he was insolvent. However, Joyce did earn income during 2002 through 2006 that she could have used to make the mortgage payments. Based upon the Accountant's analysis, in 2003, 2004 and 2005 Joyce did not earn enough to cover the costs of the mortgage payments on her own, but she did earn enough in 2002 and 2006.

The question of whether the Debtor received adequate consideration for the Money Transfers rises to the forefront of the Court's inquiry. The Defendants testified that they pooled their funds to cover the mortgage payments and household expenses. While the Debtor was contributing to the payments for the mortgage, he was living in the home with Joyce, and by making those payments he was afforded a place to stay, to have his meals, and to take care of other normal and usual living expenses. There has been no evidence provided that shows that the mortgage payments and costs were unreasonable. Thus, upon review of the facts of the instant case, the Court finds that the expenses and mortgage payments were reasonable, and as a result the Trustee cannot avoid them as fraudulent transfers. *See United States v. Goforth*, 465 F.3d 730, 736 (6th Cir.2006) (noting "that the greater weight of authority holds … that a debtor does indeed receive 'reasonably equivalent value' when he/she makes payments to his/her spouse (or co-habitant) that are used for household expenses); *Gonzalez v. Wells Fargo Bank, N.A. (In re Gonzalez),* 342 B.R. 165, 172-73 (Bankr. S.D.N.Y. 2006); *In re Meinen,* 232 B.R. 827, 842 (Bankr. W.D.Pa.1999) (declining to find that reasonable household expenses were

fraudulent transfers where the debtor-husband and spouse pooled their funds to make the payments).

Joyce made a down payment on the Commack Property with her own funds and she obtained a mortgage for the Commack Property in her name only. As most married couples do, here the Defendants pooled their funds in order to meet their expenses. Had the Debtor not lived with Joyce, he would have had to seek other living accommodations, which would have cost him money in the form of either rent or mortgage payments. Joyce clearly earned an income that could have contributed to the mortgage payments and expenses in 2002 through 2006, with the exception of 2004 (during which she earned approximately $172.00 while she was caring for her ailing mother.) However, this does not appear to be a situation where the Court would find that there was actual fraudulent intent as to the Debtor's creditors. Thus, those payments are not subject to recovery by the Trustee under either Bankruptcy Code § 548 or DCL § 276.

  b. Constructive Intent Fraudulent Conveyance

The Trustee also seeks to undo the Money Transfers by deeming them to be constructive fraudulent conveyances under 11 U.S.C. § 548(a)(1)(B), and DCL §§ 273 and 275. Under section 548(a)(1)(B) if a debtor makes a transfer while he or she is insolvent, or when they expect to incur debts that cannot be paid, and the debtor does not receive "a reasonably equivalent value in exchange for such transfer or obligation", then it is a constructive fraudulent conveyance. DCL §§ 273 and 275 require that "fair consideration" be given, which requires a review of good faith or bad faith. *In re Corcoran*, 246 B.R. 152, 159 (E.D.N.Y. 2000); *In re Lindsay*, 2010 WL 1780065, *5 (Bankr. S.D.N.Y. May 4, 2010). DCL § 272 defines "fair consideration" as:

  Fair consideration is given for property or obligation,

>    a. When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or
>
>    b. When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

As noted above, fair consideration or reasonably equivalent value was given to the Debtor for the Money Transfers as he was allowed to remain in the Commack Property at the time of the transfers. Had he not been living in the residence, then he would have had to pay rent to live elsewhere or buy a home. Thus, the Debtor received fair consideration, or the reasonably equivalent value, for the Money Transfers. The Trustee's requested relief as to the Money Transfers is denied.

### 3.  The Vessel

The Trustee seeks to avoid the Vessel Transfer to Joyce under New York Debtor and Creditor Law section 276 and Bankruptcy Code § 548(a)(1)(A). As noted above, there are several badges of fraud that can be analyzed by the Court when determining actual fraudulent intent. *See e.g., In re Kaiser*, 722 F.2d 1574, 1582 (2d Cir. 1983); *In re Saphire*, 139 F.2d 34, 35 (2d Cir. 1943); *In re Ventimiglia*, 362 B.R. 71, 81 (Bankr. E.D.N.Y. 2007).

The Debtor transferred the Vessel to Joyce three years prior to the bankruptcy, and the Defendants do not dispute that Joyce did not give any financial consideration for the Vessel. Joyce testified that the Vessel was given to her as a gift, and the Debtor testified that he transferred the Vessel to Joyce to pay her back for monies that she had paid in the beginning of their relationship. No evidence was provided as to what that amount was or what obligations were paid. There is no evidence to support this proposed excuse for said transfer. The Defendants testified that they tried to sell the Vessel, but were unable to do so until July 2006.

As discussed above, the Defendants pooled their funds to pay their expenses, including the costs of the Vessel. At the time of the transfer to Joyce, the Debtor was earning more money than Joyce. The mere transfer of the title from the Debtor to his wife Joyce did nothing to change these circumstances, and the Debtor continued to utilize the boat as he had while the boat was titled in his name. *In re Cadarette*, 601 F.2d 648, 651 (2d Cir. 1979); *In re Kaiser*, 722 F.2d 1574, 1583 (2d Cir. 1983) ("The transfer of property by the debtor to his spouse while insolvent, while retaining the use and enjoyment of the property, is a classic badge of fraud."). The transfer just served to remove the Vessel from the Debtor's name and replace it with Joyce's name at a time when the Debtor knew that he was indebted to the IRS. "Transfers made without fair consideration are presumed to leave the transferor insolvent." *In re Lindsay*, 2010 WL 1780065, *5 (Bankr. S.D.N.Y. May 4, 2010) (*citing In re Corcoran,* 246 B.R. at 163); *In re Borriello,* 329 B.R. 367 (Bankr. E.D.N.Y. 2005). To the extent that the transfer was made as a gift, any transfer for love and affection does not constitute fair consideration for a transfer made between a husband and wife. *See In re Marlar*, 252 B.R. 743 (8th Cir. B.A.P. 2000); *In re Treadwell,* 699 F.2d 1050, 1051 (11th Cir. 1983). The Vessel remained in the possession of both Joyce and the Defendant until it was ultimately sold by Joyce for $34,000.00. The Defendants may have used these proceeds to pay their expenses, but they did not pay the Debtor's creditors. This transfer to Joyce had sufficient badges of fraud for the Court to find it was a fraudulent conveyance.

The Court notes that since the Debtor did not receive any consideration for the transfer of the Vessel, he did not receive the reasonably equivalent value for the transfer or fair consideration. As this Court has previously noted in *In re Ventimiglia*, with "intra-family transfers, the burden of persuasion can also shift to the transferee if there is an absence of tangible consideration." 362 B.R. at 82. Here the Defendants have failed to provide the Court

with any evidence of consideration that would be necessary to defeat a finding that the Vessel transfer was a constructive fraudulent conveyance.

The Vessel remained in the possession of both Joyce and the Defendant, incurring expenses for maintenance and storage until it was ultimately sold. It is undisputed that until the sale date of the Vessel, the Defendants paid $300.00 per month in insurance payments and mooring and storage costs. As such, from September 2003 through July 2006, which is the period of time between when the Vessel was transferred to Joyce and the time she sold it, the carrying costs and expenses for the Vessel were $3,600.00 per year, resulting in a total aggregate amount for that period of $10,500.00.

As shown by the Accountant's analysis, Joyce did not have enough income to cover the costs of both the mortgage payments on the Commack Property and the costs of the Vessel. The only logical conclusion is that the Debtor was making the payments for the Vessel as his income was greater than hers. The transfer of the Vessel to Joyce was in name only, and the Debtor retained the ability to use the Vessel. Even though he was obligated on debts to his creditors, he continued to make the payments for the carrying costs and expenses.

Pursuant to the above findings, the Trustee has satisfied his burden of showing that there was actual fraudulent intent to keep the Vessel out of the reach of his creditors. Thus, the Vessel Transfer is avoided, and the Defendants are liable to the Debtor's estate in the amount of $44,500.00, which represents the $34,000.00 sale price of the Vessel and the $10,500.00 that was paid for the expenses relating to the Vessel.

### CONCLUSION:

Based upon the above findings of fact and conclusions of law, the Court finds that the Trustee's requested relief as to the Commack Property is denied. However, the Debtor's transfer

of the Vessel to Joyce was an actual fraudulent conveyance, as were the payments made for the Vessel's carrying costs and expenses. Thus, the Defendants are liable to the Debtor's estate in the amount of $44,500.00.

Dated: Central Islip, New York
       November 1, 2010

                                          *s/ Dorothy Eisenberg*
                                          Honorable Dorothy Eisenberg